Filed 8/30/21  In re D.M. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| In re D.M. et al., Persons Coming Under the Juvenile Court Law. | C093276 |
| LASSEN COUNTY HEALTH AND SOCIAL SERVICES AGENCY, | (Super. Ct. Nos. J6486, J6487) |
| Plaintiff and Respondent, | |
| v. | |
| K.S., | |
| Defendant and Appellant. | |

K.S., mother of the twin minors (mother), appeals from the juvenile court's order terminating her parental rights and freeing the minors for adoption.  (Welf. & Inst. Code, §§ 366.26, 395; [statutory section citations that follow are to this code].)  She challenges

1

the court's finding of adoptability and argues the court failed to apply the sibling relationship exception to adoption. We affirm the juvenile court's orders.

FACTS AND HISTORY OF THE PROCEEDINGS

On June 5, 2019, following a domestic violence incident involving mother and her boyfriend, J., Lassen County Child and Family Services (Department) filed a dependency petition on behalf of the 8-year-old twin minors, D.M. and L.M., pursuant to section 300, subdivisions (b) and (c), alleging mother emotionally abused the minors, causing the minors to have suicidal ideations, depression, and significant behavioral problems. The petition further alleged that mother had a history of domestic violence and engaging in violent altercations, at times in the minors' presence, and failed to follow through with her voluntary agreement with the Department regarding previous domestic abuse violence in the minors' presence. It was also alleged that mother placed the minors in the home of her ex-boyfriend, J., who was known to abuse alcohol and punch doors and walls and had abused the minors in the past. The petition alleged mother had a long history of alcohol abuse which endangered the minors' physical safety and emotional health and created a detrimental home environment.

The Department's investigation of mother's prior involvement with child welfare services revealed that, from 2008 to 2019, mother had 35 prior referrals, seven of which were substantiated. Following one particular incident on February 4, 2019, involving domestic violence between mother and J. in front of the minors, mother agreed to work with the Department via a voluntary case plan. As part of the voluntary case plan, mother agreed with a safety plan which included, among other things, not exposing the minors to physical or emotional violence, obtaining a restraining order against J., enrolling the minors in mental health services, and maintaining contact with the social worker. Mother entered a domestic violence shelter but soon left. She stopped attending parenting classes

2

because she felt "judged." She also reportedly allowed the minors to have visitation with J.

The minors were removed and placed with their half sibling. The Department assessed mother and determined she needed drug and alcohol services, parenting classes, and mental health assessment services. The court subsequently ordered the minors detained and ordered reunification services and supervised visitation for mother.

The Department reported that, on June 10, 2019, D.M. had been placed on a section 5150 psychiatric hold due to being out of control with his siblings and foster family. D.M. told hospital staff "it would likely happen again" if he returned to his foster placement, and that he thought he might be able to do better if he was away from his siblings. He was released the following day and placed in an intensive services foster care (ISFC) placement. Mother's visits with the minors were reportedly appropriate but mother had trouble controlling the minors' "difficult behaviors."

At the jurisdiction hearing, mother submitted on the petition. The court found the allegations true, exercised jurisdiction over the minors, and ordered continued supervised visitation for mother.

The disposition report stated the minors were placed together in the same ISFC placement. D.M.'s involuntary psychiatric hold was reportedly due to the fact that D.M. had been threatening to harm himself and others in the foster home in which he was placed at the time. L.M. had frequently made statements that he too wanted to die or to harm himself or others. He destroyed property in the foster home and punched one of his siblings in the face during a visit. On June 25, 2019, L.M. threatened to harm himself, his siblings, and his foster family and was taken to the hospital and placed on a section 5150 involuntary psychiatric hold due to suicidal ideations. The following day, he was transferred to the Sutter Center for Psychiatry, where he remained until July 3, 2019, when he was transferred to the ISFC placement where D.M. was also placed. L.M. was diagnosed with Post Traumatic Stress Disorder (PTSD), Disruptive Mood Regulation

3

Disorder (DMDD), and Attention Deficit Hyperactive Disorder (ADHD), for which he was prescribed medication. The Department had some concerns that the minors were in the same placement together given their history of "triggering each other's behaviors." However, the ISFC foster family stated they believed they could handle the minors' behaviors, and D.M. expressed a desire to be placed with L.M.

At the uncontested disposition hearing on July 29, 2019, the court ordered continued out-of-home placement for the minors and continued services and supervised visitation for mother.

On December 4, 2019, the minors' caregiver gave a seven-day notice and the minors were moved to a new placement.

According to the January 2020 status review report, alleged father N.M. informed the social worker that he was not on the minors' birth certificates, but he held them out as his own and was willing to parent them. The Department requested that the court elevate N.M.'s status to presumed father.

The minors were both developmentally on track and participating in school. Both were engaged in therapy and had significant behavioral issues including yelling at their caretakers and refusing to do what was asked of them. Nonetheless, the current caretakers expressed that they were open to adoption and were committed to caring for and providing for the minors' needs.

Mother was homeless and unemployed and had not followed through with her alcohol and drug services. She admitted having had a physical altercation with J. on September 13, 2019. Although the Department provided mother with money for gas, a hotel room for two nights, and arrangements to move to a domestic violence shelter, mother spent the gas money, refused the shelter, and returned to her relationship with J. She had refused to provide drug tests since October 2019 and had cancelled or failed to attend multiple visits with the minors, causing the minors to act out by yelling and throwing things. J. became incarcerated on November 21, 2019, and mother failed to call

4

or attend her visit with the minors. Despite promising to meet with the social worker at the Department office and engage in behavioral health services, mother failed to attend the appointment and did not engage in those services. She admitted using marijuana and methamphetamine regularly and was continuing to engage in physical domestic disputes with J. The Department recommended that the court reduce visitation and terminate mother's reunification services.

At the contested six-month review hearing on February 10, 2020, mother stipulated to a case plan which included her cooperation with the Department, participating in and completing various services, working with a sponsor, and taking all prescribed medication. The court found mother's progress in alleviating or mitigating the causes necessitating placement to be adequate and ordered continued services and visitation.

On February 27, 2020, D.M. was transferred to a new placement with a lower level of care due to the fact that he no longer needed the same level of care his sibling was receiving.

In its 12-month status review report, the Department requested that the court terminate mother's reunification services and set the matter for a section 366.26 hearing. D.M. was placed in a foster home and L.M. was placed in a separate ISFC placement. D.M. was still engaging in therapy and receiving intensive support services. Current and past caretakers reported that D.M. became upset and dysregulated over trivial matters and escalated quickly, including banging his head against the floor and wall and throwing things.

L.M. was also still engaged in therapy. He was reportedly suspended from school due to his behaviors, including swearing, calling the principal a "fucking bitch," ripping up papers, kicking doors, turning over a table, hitting his head against the wall, breaking his glasses, and making statements about hurting himself and others at the school. L.M. was taking medication for his diagnosis of Intermittent Explosive Disorder, Adjustment

5

Disorder. On January 6, 2020, L.M. was hospitalized on a section 5150 psychiatric hold and his caretaker gave a 14-day notice. He was then placed in another therapeutic foster home while D.M. remained in his current placement. Since being in his new placement, however, L.M. was becoming more stabilized and had not made self-harm statements in weeks. The Department reported that both minors were stabilized in their respective placements, and that being separated had benefitted each of them.

Mother was living at a domestic violence shelter and was engaged in various services. She maintained regular contact with the Department and was attending visitation regularly. She provided random drug tests, all of which were positive, and tested positive for methamphetamine as recently as April 29, 2020.

At the continued 12-month review hearing on August 3, 2020, the court found mother's progress in her case plan was minimal, terminated her reunification services, reduced her visitation, and set the matter for a section 366.26 hearing.

Department's Section 388 Petition

On October 5, 2020, the Department filed a section 388 petition requesting that the court find visitation between mother and the minors to be detrimental. The petition alleged that both minors displayed behavioral issues in anticipation of and following visits with mother. The petition argued the requested finding would allow the minors to restabilize their mental health.

Section 366.26 Report

The November 2020 section 366.26 report recommended that the court terminate parental rights and free the minors for adoption. The report reiterated the visitation issues outlined in the section 388 petition. D.M. was still engaged in therapy and was reportedly doing "very well" with minimal outbursts in his foster home, but that he displayed more difficult behaviors (such as being confrontational with other children in the home and being argumentative with the foster parent) once visits with mother started.

6

L.M. was also engaging in therapy and appeared to be more stabilized in his current placement.  However, like his brother, L.M.'s behaviors escalated prior to visits with his mother.

The minors had been in separate placements since January 24, 2020.  They were reportedly benefitting from being separated and were both stabilizing in their respective foster homes.  Both minors expressed to the social worker that they preferred to remain where they were, although each minor tried to convince the other to join him in his respective placement.  After discussions between the Department and the service providers, it was determined that it would not be in the best interest of either minor to place the two minors together.  However, the caretakers were building a rapport with one another in order for the minors to maintain their relationship and have regular contact with one another.

The minors' respective caretakers expressed that while they were open to considering a permanent plan of adoption, they each wanted to wait to make a full commitment to such a plan while mother still had contact with the minors.  The Department opined that, because the minors' behaviors escalated when having contact with mother, it would be beneficial to the minors' caretakers for the minors to be given a period of time to therapeutically process the loss of their mother if and when all contact with her ceased.  The state adoptions service was working with the caretakers and was also seeking other potential placements if needed to provide permanency for the minors.

Adoption Assessment Report

The Department filed an adoption assessment report concluding the minors were likely to be adopted and recommending termination of parental rights.  The minors, who were now 10 years old, were initially placed together but were eventually placed separately and were each in their respective fourth foster home placement.  Both minors understood adoption and permanency and were eager to find stability in their current

7

placements although they held out hope that they would be returned to mother. Given the multiple moves and behavioral concerns regarding adjustment to new placements, both minors were ambivalent about adoption. However, D.M. fluctuated between wanting to be adopted and wanting "to wait to see if I can live with my mom again." L.M. refused to talk about adoption. He was sad that D.M. was not placed with him but wanted to remain with his current caregivers.

The minors exhibited extreme behaviors when mother cancelled or missed visits, and mother's instability in maintaining visitation was reportedly affecting the minors' ability to regulate their feelings and reactions.

The minors' respective caretakers indicated an interest in providing permanency for the minors but needed more time to decide. The assessment noted that, if the current caretakers were unwilling or unable to commit to permanency, the Department would need to use further child specific recruitment tools to identify suitable caretakers.

Combined Section 388 and Section 366.26 Hearing

At the November 2, 2020 hearing, the court first addressed the Department's section 388 petition and, after considering argument from counsel, granted the petition and terminated mother's visitation.

Next, the court heard argument regarding the recommendation to terminate parental rights. Mother's counsel argued the court should consider guardianship because adoption would substantially impair the minors' sibling relationship. Counsel argued the twin minors were raised together and had been together until the dependency proceedings were instituted. They were in regular contact with one another and leaned on each other for support despite being in separate placements. Counsel noted the minors were trying to convince one another to go to the other's placement, and that their bond as twins was "unlike other siblings have." The Department argued guardianship did not provide the minors with the permanency they needed, and noted any issues regarding adoption would

8

apply equally to guardianship and, because adoption is the preferred plan, adoption should be the chosen plan for permanency.

The court noted that both minors suffered from issues most children did not suffer from and that both needed therapy and when the two minors were placed together, "instead of calming each other, they create an inferno and more problems arise than were there when they were separated by themselves." The court further noted that, when the minors were separated, they both seemed to stabilize. The court stated that, because the minors were currently visiting with mother, the caretakers were unable to determine whether it would be appropriate to bring the two minors together until they could see how the minors reacted without their mother being a part of the equation. The court opined that "it may be better to have [the minors] separated than together because it seems they do many negative things when together and when they are separated they are more likely to do very positive things." Expressing its hope that the foster families would continue the bond and communication between the minors, the court found the minors had "a much better chance of living a normal life apart from one another." The court found the minors were likely to be adopted and terminated parental rights.

## DISCUSSION

### I

### *Finding of Adoptability*

Mother contends there was insufficient evidence to support the court's finding that the minors were likely to be adopted within a reasonable time. She claims the minors were in their fourth foster home and their respective caretakers were unsure about adoption, and there were no other potential adopters identified.

To terminate parental rights, "the [juvenile] court must find by clear and convincing evidence that it is likely that the child will be adopted." (*In re Asia L.* (2003) 107 Cal.App.4th 498, 509; see also § 366.26, subd. (c)(1).) There must be "convincing

9

evidence of the likelihood that adoption will take place within a reasonable time." (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624 (*Brian P.*).) "Although a finding of adoptability must be supported by clear and convincing evidence, it [i.e., the determination that it is likely the child will be adopted within a reasonable time] is nevertheless a low threshold." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

The issue of adoptability "focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' " (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649, italics omitted.) But, " 'the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family.' " (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154, italics omitted; accord, *In re Sarah M., supra*, at pp. 1649-1650.)

We review the juvenile court's finding on this issue under the substantial evidence standard, giving it the benefit of every reasonable inference and resolving any evidentiary conflicts in favor of affirming. (*In re I.I.* (2008) 168 Cal.App.4th 857, 869.) That is, we must determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1232.) If so, "[i]t is irrelevant that there may be evidence which would support a contrary conclusion." (*In re K.B., supra*, 173 Cal.App.4th at p. 1292.)

Here, there was sufficient evidence to support the court's finding of adoptability. The minors were 10 years old and both in their fourth placement. There is no doubt the

10

minors had serious behavioral issues which led to their earlier removals from and transfers to foster placements. Those behavioral issues included physical outbursts, hitting, kicking, overturning tables, and perhaps most troubling, threats to themselves and others. However, despite those issues in prior placements, those behaviors were significantly reduced when the minors were separated and put into separate placements. The minors began to stabilize and become more comfortable in their respective foster homes. The behaviors only appeared to escalate in anticipation of or after a visit with mother or when mother cancelled or failed to attend a visit at all. Otherwise, the minors were reportedly healthy and developmentally on track and were settling into their respective foster homes. "A child who is happy, healthy and young, with no discernable developmental problems, can be found to be generally adoptable" even if no prospective adoptive family has been identified as ready to adopt. (*In re B.D.* (2019) 35 Cal.App.5th 803, 817.)

Mother argues the minors' current caregivers were not yet committed to adopt and, even if they had been, that did not constitute clear and convincing evidence of the minors' adoptability. But the court's adoptability finding was not premised on the willingness of the caregivers to adopt the minors. Indeed, the court noted the caregivers could not determine whether to commit to adoption until mother's impact on the minors was no longer an issue. Rather, the court based its findings on the Department's reports and the adoption assessment, both of which provided sufficient evidence that the minors were healthy and developmentally on track, and that both minors wanted stability and permanency and, if they could not be with mother, to be with their current caregivers. In any event, as previously noted, the minors' adoptability was not contingent upon there being a proposed adoptive parent ready and waiting. (*In re Sarah M., supra*, 22 Cal.App.4th at p. 1649.)

Relying on *Brian P., supra*, 99 Cal.App.4th at page 624, mother asserts that the Department's adoption assessment report did not conclude the minors were generally or

11

specifically adoptable and, even if it had concluded the minors were generally adoptable, that would have been insufficient to support a finding of adoptability. She further argues that, to prove general adoptability, the Department should have provided information regarding identified families interested in adopting a child with the minors' history.

To the extent mother is challenging the sufficiency of the adoptability assessment report, she failed to raise the issue in the juvenile court and has therefore forfeited her right to raise the issue on appeal. " ' "An appellate court will ordinarily not consider procedural defects or erroneous rulings in connection with relief sought or defenses asserted, where an objection could have been, but was not, presented to the lower court by some appropriate method." [Citation.]' [Citation.]" (*In re G.C.* (2013) 216 Cal.App.4th 1391, 1398-1399.) "This is the general rule, because any other rule would allow a party to deliberately stand by in silence and permit the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable. [Citations.] The forfeiture doctrine has been applied in dependency proceedings in a wide variety of contexts, including cases involving failures to obtain various statutorily required reports [citations]." (*Ibid.*) As relevant here, "failure to object to the admission of improper or inadequate evidence waives the right to raise the issue on appeal. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 307, p. 317.)" (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 411; accord, *In re Aaron B.* (1996) 46 Cal.App.4th 843, 846; *In re Urayna L.* (1999) 75 Cal.App.4th 883, 886.)

In any event, mother's claims are unavailing. First, her reliance on *Brian P.,* is misplaced. There, the juvenile court did not have the benefit of an adoption assessment report and was merely presented with old adoption assessment reports that had nothing to do with the minor and the agency's conclusory opinion that the minor was adoptable with few if any facts to support that opinion. (*Brian P., supra*, 99 Cal.App.4th at pp. 624-625.) *Brian P.* is inapposite.

12

Next, mother misstates the facts and the law. The Department identified the current caretakers as potential adopters of the minors, noting that those caretakers had yet to commit and were waiting to see how the minors fared when mother was no longer in the equation. There is no requirement, as mother suggests, that in demonstrating adoptability, the Department must provide "statistical information regarding the number of identified families interested in adopting the child or a child with the same age, physical condition, and emotional state." Rather, the assessment report must, among other things, "describe the efforts made to identify a prospective adoptive parent or legal guardian for the child; and provide a preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or legal guardian." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 590; § 366.21, subd. (i)(1)(D) & (F).) The adoption assessment report here did just that. Further, "the law does not require a juvenile court to find a dependent child 'generally adoptable' before terminating parental rights. All that is required is clear and convincing evidence of the likelihood that the dependent child will be adopted within a reasonable time. [Citations.]" (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.) An agency may satisfy that requirement by showing that a child is generally adoptable, but in doing so it need not also show there is a prospective adoptive family " ' "waiting in the wings." ' " (*In re Jayson T.* (2002) 97 Cal.App.4th 75, 85, disapproved on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 413–414.)

Finally, mother misconstrues the law when she cites *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223 for the proposition that, "The mere fact that it is possible the child might be adopted since prospective adoptive parents are interested does not constitute clear and convincing evidence of the minor's adoptability." The citation to which mother refers is actually the position taken by the appellant in that case, a position the appellate court rejected. There, the court summarized appellant's position stating, "The thrust of [appellant's] position is, if it is determined the minor is at risk, it might be

13

difficult to find someone who will actually adopt her. . . .  Thus, until the test results are in, it is 'sheer speculation that any family . . . will adopt the minor.' " (*Id.* at p. 224.)  In rejecting appellant's argument, the appellate court noted there was sufficient evidence adoption was likely to occur in the foreseeable future given that, although the minor's current foster family did not wish to adopt her, another family within the foster system expressed an interest in doing so.  The appellate court noted that, in reaching its adoptability decision, the juvenile court recognized it might not be known until the minor reached her teenage years whether she had any dysfunction.  (*Id.* at pp. 224-225.)  *In re Jennilee T.* is inapposite.

The court's finding that the minors were adoptable was supported by substantial evidence.

II

*Sibling Exception to Adoption*

Mother further contends the juvenile court erred when it failed to apply the sibling relationship exception to adoption and thus avoid termination of her parental rights.  The claim lacks merit.

Section 366.26, subdivision (c)(1)(B), provides in relevant part that when a court finds a child is likely to be adopted, "the court shall terminate parental rights and order the child placed for adoption . . . unless . . . [t]he court finds a compelling reason for determining that termination would be detrimental to the child due to . . . [t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest,

14

as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v); see *In re C.B.* (2010) 190 Cal.App.4th 102, 129.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge.' " (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

Here, there was evidence the twin minors had a bond. They had lived together prior to removal and, once detained, had been placed together in several of the same foster homes. However, it became apparent to the foster caretakers and the Department that the minors "trigger[ed] each other's behaviors" and that placing them together became unworkable for the various foster caretakers and was not in the minors' best interests. Once the minors were placed separately, however, they began to benefit from being separated and were progressively stabilizing in their respective foster homes. Each minor preferred to remain with his respective caregivers but tried to convince the other to join him in his placement. The Department and the service providers determined it was not in the minors' best interests to be placed together in the same foster home. It also became apparent to the court that, when the minors were placed together, more problems arose and, when they were separated, they seemed to stabilize.

15

Mother argues the court should have opted for a permanent plan of legal guardianship rather than adoption in order to ensure the minors maintained their strong relationship. She claims the court failed to balance the benefits of ongoing contact between the siblings against the benefits of adoption by considering that the minors were raised in the same home for the first eight years of their lives and then lived in the same foster homes for several months after removal; they shared common experiences being raised by mother and being placed in foster homes and they had a close bond despite that they provoked each other, and ongoing contact was in their best interests, including their long-term emotional best interests, as evidenced by the fact that they enjoyed their time together and wanted to have ongoing contact with one another. (*In re Erik P.* (2002) 104 Cal.App.4th 395; *In re Hector A.* (2005) 125 Cal.App.4th 783, 786.) We disagree.

As a preliminary matter, mother properly acknowledges that the statutory preference for a child who has not reunified with his parent is adoption and, once that child is deemed adoptable, it is the parent's burden to show that termination of parental rights would be detrimental to the child under one of the exceptions. (§ 366.26, subd. (b)(1); *In re C.B., supra*, 190 Cal.App.4th at p. 122.) " 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid.*)

Mother did not demonstrate that termination of her parental rights would be detrimental to the minors under the sibling relationship exception. The court considered the Department's report which included, among other things, information about the minors' background, the facts and circumstances that led to their removal from mother, facts regarding their various foster home placements and their intermittent psychiatric holds and hospitalizations, evaluations of the minors (including their experiences while in foster care), and their attitudes toward adoption. The court also considered the adoption

16

assessment report. At the hearing, the court first acknowledged the common bond between the two minors and noted that, while the goal was to not separate children and to keep families whole, there was a compelling reason not to do so here given that the minors had issues going on, needed therapy, and were "suffering from issues that a lot of children do not suffer from." The court further noted the minors had serious needs that, if the minors were placed together and created "an inferno and more problems" as they typically did, would likely not be met. Finally, after weighing all of the information, the court concluded that the minors should be given "every opportunity to try and live a normal life," which they stood "a much better chance of living . . . apart from one another." Mother bore the burden to demonstrate the statutory exception applied and failed to make the requisite showing. (*In re C.B., supra*, 190 Cal.App.4th at p. 122.)

Finally, mother asserts that, without a post-adoption agreement, there was no guarantee the minors would have ongoing contact with each other. While mother is correct, the absence of a post-adoption agreement is not dispositive of the sibling relationship exception issue. In any event, the minors were having regular visitation, and the caretakers were building a rapport with one another in order for the minors to maintain their relationship and have regular contact with one another. The court expressed its hope that the respective caregivers would continue the contact between the minors. Given the minors' expressed desire to maintain contact, and the caregivers' willingness to fulfill the minors' wishes, it is not unlikely the caregivers would at least maintain the status quo.

Considering all of the evidence, the juvenile court properly concluded the benefits of adoption outweighed the benefits of ongoing contact between the siblings. Therefore, there was substantial evidence to support the court's order terminating parental rights.

DISPOSITION

The juvenile court's orders are affirmed.

                            _____

                            HULL, J.

We concur:

_____

RAYE, P. J.

_____

DUARTE, J.